No. 22-60146

# In the United States Court of Appeals for the Fifth Circuit

STATES OF LOUISIANA, ARIZONA, ALABAMA, ARKANSAS, KENTUCKY, MISSOURI, MONTANA, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, TEXAS, AND UTAH,

*Petitioners*,

*v.*

UNITED STATES DEPARTMENT OF ENERGY AND JENNIFER GRANHOLM, SECRETARY OF ENERGY,

*Respondents.*

On Petition for Review of an Order of the United States Department of Energy,

Agency No. EERE-2021-BT-STD-0002

## STATE PETITIONERS' OPENING BRIEF

**MARK BRNOVICH**
**ATTORNEY GENERAL**

Joseph A. Kanefield
*Chief Deputy & Chief of Staff*

Brunn ("Beau") W. Roysden III
  *Solicitor General*

\*  Counsel of Record

Drew C. Ensign\*
  *Deputy Solicitor General*
Anthony R. Napolitano
Robert J. Makar
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, AZ 85004
Phone:    (602) 542-5025
Fax:      (602) 542-4377

*Counsel for the State of Arizona*

*(Additional Counsel Listed in Signature Block)*

Dated: September 2, 2022

## CERTIFICATE OF INTERESTED PARTIES

This brief is filed exclusively on behalf of governmental parties, and therefore not required to furnish a certificate of interested parties under Fifth Circuit Rule 28.2.1. The undersigned counsel of record nonetheless certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. The States of Arizona, Alabama, Arkansas, Kentucky, Louisiana, Missouri, Montana, Oklahoma, South Carolina, Tennessee, Texas, and Utah.

2. Drew C. Ensign, Brunn ("Beau") W. Roysden III, Anthony R. Napolitano, Robert J. Makar, Edmund Gerard LaCour, Jr., Matthew F. Kuhn, Bryan Cleveland, Thomas T. Hydrick, Eric J. Hamilton, and Melissa A. Holyoak—*Counsel* for Petitioners.

3. Mark Brnovich, Arizona Attorney General; Steve Marshall, Alabama Attorney General; Leslie Rutledge, Arkansas Attorney General; Daniel Cameron, Kentucky Attorney General; Jeff Landry, Louisiana Attorney General; Eric S. Schmitt, Missouri

Attorney General; Austin Knudsen, Montana Attorney General; John M. O'Connor, Oklahoma Attorney General; Alan Wilson, South Carolina Attorney General; Herbert H. Slattery III, Tennessee Attorney General; Ken Paxton, Texas Attorney General; and Sean D. Reyes, Utah Attorney General.

4. U.S. Department of Energy.

5. Jennifer Granholm, Secretary of Energy.

6. Amanda Mundell, Kathryn McIntosh, and Stephen C. Skubel *Counsel* for Petitioners.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner States respectfully request oral argument. Given the importance of the issues presented, as well as the complexity of the statutory interpretation questions at issue, the States submit that oral argument will assist this Court in resolving the issues presented.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION .................................................. 8

STATEMENT OF THE ISSUES PRESENTED ............................... 8

STATEMENT OF THE CASE AND FACTS .................................... 9

SUMMARY OF THE ARGUMENT .................................................. 24

STANDARDS OF REVIEW .............................................................. 34

ARGUMENT ...................................................................................... 34

    I.    The Repeal Rule Violates EPCA ........................................... 34

        A.    DOE's Conclusion That The Performance Rules Run Afoul Of The Anti-Backsliding Provision (§(o)(1)) Violates EPCA ........................................ 36

            1.    The Plain Text Of Subsection (o) Alone Precludes DOE's Construction Of "Amend" ....... 36

            2.    The Text Of Subsection (q) Also Squarely Precludes DOE's Interpretation ......................... 41

            3.    The Applicable Canons Of Construction Confirm That The Repeal Rule Violates EPCA ................................................................. 46

        B.    *Chevron* Deference Cannot Save The Repeal Rule ..... 51

        C.    The Performance Rules Permissibly Deferred Establishment Of Specific Efficiency Standards ........ 53

    II.    The Repeal Rule Is Arbitrary And Capricious .................... 57

        A.    The Repeal Rule Fails To Explain Adequately DOE's Change In Policy ............................................... 57

        B.    DOE Failed To Consider Reliance Interests Adequately ................................................................. 62

        C.    The Repeal Rule Fails To Supply An Adequate Rationale For DOE's Refusal To Create Specific Standards For Performance Classes ........................... 65

III.  This Court Should Vacate The Repeal Rule .......................... 68

    A.  The States Have Article III Standing To Bring This Challenge ........................................................... 68

    B.  Vacatur Is The Appropriate Remedy Here .................. 70

CONCLUSION ......................................................................... 71

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................ 70

*Brown v. Gardner,*
  513 U.S. 115 (1994) .................................................................. 41, 44

*Chevron U.S.A. Inc. v. NRDC,*
  467 U.S. 837 (1984) ...................................................................... 52

*Corrosion Proof Fittings v. EPA,*
  947 F.2d 1201 (5th Cir. 1991) ............................................................ 68

*DHS v. Regents of the Univ. of Calif.,*
  140 S. Ct. 1891 (2020) ............................................................. 6, 62, 63

*Dillmon v. Nat. Transp. Safety Bd.,*
  588 F.3d 1085 (D.C. Cir. 2009) .......................................................... 58

*Director, Office of Workers' Compensation Programs, Dept. of Labor v.
  Newport News Shipbuilding & Dry Dock Co.,*
  514 U.S. 122 (1995) .................................................................. 51, 61

*Dolan v. U.S. Postal Serv.,*
  546 U.S. 481 (2006) ...................................................................... 44

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ...................................................................... 52

*Epic Sys. Corp. v. Lewis,*
  138 S. Ct. 1612 (2018) ................................................................... 52

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...................................................................... 58

*Glossip v. Gross,*
  576 U.S. 863 (2015) ...................................................................... 66

*Henderson v. Shinseki,*
    562 U.S. 428 (2011) ............................................................ 48

*In re Glenn,* 900 F.3d 187, 189 (5th Cir. 2018) ...................................... 34

*King v. St. Vincent's Hosp.,*
    502 U.S. 215 (1991) ............................................................ 49

*Loughrin v. United States,*
    134 S. Ct. 2384 (2014) .................................................... 30, 49

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................ 69

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ............................................................ 69

*McFadden v. United States,*
    576 U.S. 186 (2015) ............................................................ 55

*Montanile v. Bd. of Tr. of Nat. Elevator Indus. Health Benefit Plan,*
    136 S. Ct. 651 (2016) ......................................................... 51

*Motor Vehicle Mfrs. Assoc. of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................. 34, 57, 60

*National Cable & Telecommunications Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................ 61

*National Parks Conservation Ass'n v. Semonite,*
    925 F.3d 500 (D.C. Cir. 2019) ............................................... 70

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019) ......................................................... 55

*NRDC v. DOE,*
    No. 20-4256 (2d. Cir.) ........................................................ 19

*NRDC v. Herrington,*
    768 F.2d 1355 (D.C. Cir. 1985) ............................................... 9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S 639 (2012) ......................................................... 29, 47

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) ................................................................ 48

*Sturgeon v. Frost*,
136 S. Ct. 1061 (2016) ......................................................... 42

*Sturgeon v. Frost*,
139 S. Ct. 1066 (2019) ......................................................... 49

*Teva Pharms. USA, Inc. v. FDA*,
441 F.3d 1 (D.C. Cir. 2006) ................................................. 25

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021)................................................. 67

*Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015) ..................... 70

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ......................................................... 29, 46

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988) ....................................................... 42, 43

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ........................................... 70

*Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857–58 (D.C. Cir.
2021)................................................................................ 68

*Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992)................................. 69

## STATUTES

42 U.S.C. § 6292 ..................................................................... 9

42 U.S.C. § 6295(o) .................. 9, 10, 16, 18, 19, 27, 30, 31, 32, 50, 51, 52

42 U.S.C. § 6295(q) ......................................................... *passim*

5 U.S.C. § 706 ......................................................................... 6

## REGULATIONS

72 Fed. Reg. 58,190 (Oct. 12, 2007) ........................................................ 32

74 Fed. Reg. 44,914 (Aug. 31, 2009) ....................................................... 33

77 Fed. Reg. 32,308 (May 31, 2012) ........................................................ 20

83 Fed. Reg. 17,768 (April 24, 2018) ....................................................... 11

84 Fed. Reg. 33,869 ................................................................................. 14

84 Fed. Reg. 33,874 ................................................................................... 3

85 Fed. Reg. 68,723 (Oct. 30, 2020) .. 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21

85 Fed. Reg. 81,359 (Dec. 16, 2020) ....................................................... 20

86 Fed. Reg. 43,970 (Aug. 11, 2021) ...................................................... 22

87 Fed. Reg. 2,673 (Jan. 19, 2022) .. 3, 6, 22, 23, 24, 27, 31, 32, 33, 38, 40, 41, 46, 47, 51, 55, 57, 60, 62, 64, 66, 67, 68

## OTHER AUTHORITIES

American Heritage Dictionary 42 (3d ed. 1981) .................................... 38

Black's Law Dictionary (11th ed. 2019) ................................................. 38

S. Rep. No. 95-516 (1975) .......................................................................... 9

Webster's New International Dictionary 1 (2d ed. 1954) ....................... 56

## INTRODUCTION

A famous Amstel Light commercial in the late 1990s has the tagline, "Sorry, we're from Amsterdam. We didn't know light beer was supposed to [stink]." Perhaps inspired by those Dutch spokesmen, the Department of Energy ("DOE") briefly decided in 2020 to let appliance manufacturers create dishwashers and laundry machines whose performance was not lamentably middling. But that flirtation with providing consumers with non-mediocre options proved fleeting.

In January 2022, DOE rescinded its prior consumer-choice-enhancing regulations, reasoning that they violated the applicable statutory regulations. In the agency's view, those statutory provisions create one-way ratchets: efficiency must always improve, and performance typically (and predictably) must always correspondingly decline as result. And if consumers do not like it—and they emphatically made clear that they don't—they need to take it up with Congress, which putatively imposed the lousy-performance-only mandate. Like the non-Dutch light beer in Amstel's telling, the quality of dishwashers and washing machines is unthinkingly *presumed* to be shabby, and any other possibility is essentially inconceivable.

1

But DOE is simply wrong: the applicable regulations explicitly allow it to create new classes of appliances with "a *performance-related feature* which other products within such type (or class) do not have"—*i.e.*, dishwashers/washers that effectively complete cleaning cycles in reasonable amounts of time—and such new classes expressly may have "higher *or lower* standard[s]" of efficiency. 42 U.S.C. §6295(q)(1)(B) (emphasis added). That is precisely what the 2020 rules did: create new classes of appliances with a new performance feature (faster cycle times), which DOE concluded justified a "lower standard" of efficiency.

But the challenged rule here rests on DOE's misunderstanding of its own authority: *i.e.*, that DOE can *never* create a new class with lower efficiency standards not withstanding Congress's explicit grant of authority to adopt new classes with "higher *or lower*" efficiency standards. That tyranny-of-mediocrity construction violates the underlying statute, and the 2022 rule should therefore be set aside.

\*    \*    \*

Turning to the particulars: This is a challenge to a DOE rule regarding regulation of dishwashers and laundry washing machines. The challenged rule (the "Repeal Rule") rescinded two prior rules that had

created new classes of dishwashers and clothes washers/dryers for purposes of DOE efficiency regulations. *See* Energy Conservation Program: Product Classes for Residential Dishwashers, Residential Clothes Washers, and Consumer Clothes Dryers, 87 Fed. Reg. 2,673 (Jan. 19, 2022). All of these rules were issued under the Energy Policy and Conservation Act ("EPCA" or "Act"), which *inter alia* gives DOE authority to regulate efficiency of consumer appliances.

Those two prior rules ("Performance Rules") were promulgated in response to consumer complaints that pre-Performance-Rules DOE standards had resulted in poorly performing appliances. In particular, to achieve desired energy and water efficiency, dishwashers and washing machines became progressively and significantly slower: For example, dishwashers often take as much as three hours to complete a cleaning cycle. 84 Fed. Reg. 33,874; *CEI Comment* (Admin. Record Index #239), Attachment C, *Hoffman Evaluation* at 2. Moreover, diminished cleaning performance often means that dishwasher and laundry cycles have to be re-run, since they often fail to clean dishes and clothes adequately the first time—lessening or outright defeating the efficiency that the

standards are designed to serve. *CEI Comment* Attachment B at 8; *CEI Comment* at 4.

EPCA explicitly permits DOE to create new classes of appliances that have "a *performance-related feature* which other products within such type (or class) do not have." 42 U.S.C. §6295(q)(1)(B) (emphasis added). When DOE exercises that authority, the new class may have an efficiency standard that is either "higher *or lower*." *Id.* emphasis added).

So DOE did just that: The Performance Rules thus created new classes of appliances, with an eye towards addressing pervasive consumer concerns. The new classes accordingly have new "performance-related feature[s]," 42 U.S.C. §6295(q)(1)(B)—*i.e.*, the new classes were "short-cycle product classes" that operated more quickly. 87 Fed. Reg. at 2,673 (hereinafter, "Short-Cycle Classes" or "Performance Classes"). For these Performance Classes, dishwashers would have a "normal cycle of 60 minutes or less," while top-loading and front-loading washing machines would have typical cycle times of less than 30 and 45 minutes, respectively. *Id.*

These new Performance Classes supplemented the existing classes of dishwashers and clothes washing machines ("Long-Cycle Classes" or

"Legacy Classes"), rather than replacing them: companies would be free to design, manufacture, and sell appliances from all product classes and consumers would be free to buy them. Performance Class appliances would thus be sold side-by-side with Legacy Classes.

Consumers thus would have been free to choose from a broader range of options, which had differing tradeoffs between performance and energy efficiency. There is no reason to believe (and the Repeal Rule points to none) that consumers that wanted to purchase Legacy Class appliances would have been unable to do so if the Performance Rules had not been repealed. Instead, those rules unambiguously expanded consumer choice. The Repeal Rule, in contrast, consciously constricts such choice, forcing consumers to buy products whose performance is intentionally degraded. Afraid that consumers would make the "wrong" choice if given one, DOE contrived to save them from that choice entirely.

The Repeal Rule's principal (and indispensable) rationale is that the Performance Rules were unlawful. Specifically, DOE contends that the Performance Rules "amended the existing standards in violation of EPCA." 87 Fed. Reg. at 2,678.

DOE thus does not meaningfully contend that the Repeal Rule is good public policy that it adopted to serve any efficiency or consumer-welfare-maximizing goals. Instead, DOE argues that the agency had misconstrued its own authority a mere one year prior in issuing the Performance Rules, and it is thus compelled to rescind them now, regardless of whether they are good policy or bad.

But DOE had it right the first time. The relevant provision (subsection (q)) explicitly gives DOE authority to create new classes with a new "performance feature" even if they have a "lower" standard of efficiency. 42 U.S.C. §6295(q)(1)(B). The Repeal Rule, however, repeatedly reads the word "amended" in subsection (o) contrary to its plain meaning and in a manner that implicitly prohibits what subsection (q) *explicitly authorizes*. This reading squarely violates EPCA, and the Repeal Rule's central premise is thus "not in accordance with law." 5 U.S.C. §706(2)(A). And because "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action," *DHS v. Regents of the Univ. of Calif.,* 140 S. Ct. 1891, 1907 (2020) (cleaned up), the Repeal

Rule necessarily fails because its central premise cannot withstand scrutiny.

Moreover, even if DOE's legal interpretation were correct, the Repeal Rule still violates the APA as arbitrary and capricious decision-making. In particular, DOE failed (1) to give an adequate explanation for departing from DOE's prior (correct) positions, (2) to consider adequately the reliance interests that the Repeal Rule disrupts, and (3) supply an adequate rationale for refusing to issue efficiency standards for the new Performance Classes.

It is also worth stressing at the outset what this case does not involve: any contention that DOE is forbidden from repealing the Performance Rules on the grounds that they, in DOE's current leadership's view, constitute bad *policy* (as long as DOE complied with the APA in doing so). But what DOE has done here is more pernicious: seeking to duck accountability for giving consumers fewer choices by claiming that they lack authority to do anything else—*i.e.*, they are legally compelled to do so, and thus the blame rests with Congress. It further allows DOE to circumvent the requisite policy analysis of considering alternatives (such as retaining the Performance Classes) by

the simple expedient of asserting that such alternatives are unlawful. But this attempted blame shifting and duty shirking fails as DOE *unambiguously* possesses the very authority it now strategically purports to lack—but correctly recognized that it had barely a year prior.

The States of Arizona, Louisiana, Alabama, Arkansas, Kentucky, Missouri, Montana, Oklahoma, South Carolina, Tennessee, Texas, and Utah, (the "Petitioner States" or "States") filed this action to challenge the Repeal Rule. Because that rule contravenes EPCA and violates the APA, this Court should vacate it.

## STATEMENT OF JURISDICTION

The Repeal Rule was published in the Federal Register on January 19, 2022. Petitioner States filed a timely petition for review in this Court on March 16, 2022. This Court has jurisdiction under 42 U.S.C. §6306(b).

## STATEMENT OF THE ISSUES PRESENTED

The issues presented are:

(1) Whether the Repeal Rule violates EPCA.

(2) Whether the Repeal Rule is arbitrary and capricious, and thus violates the APA.

## STATEMENT OF THE CASE AND FACTS

### *EPCA And DOE Regulation Of Efficiency Standards*

EPCA "was enacted in 1975 as part of a 'comprehensive national energy policy.'" *NRDC v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985) (quoting S. Rep. No. 95-516, at 116 (1975)). Under EPCA, DOE sets efficiency standards for "covered products," which include "Dishwashers" and "Clothes washers." 42 U.S.C. §6292(a)(6)-(7). This case turns largely on the interplay of subsections (o) and (q).

Under subsection (o), DOE is generally required to set standards "for any type (or class) of covered product …. designed to achieve the maximum improvement in energy efficiency… which the Secretary determines is technologically feasible and economically justified." *Id.* §6295(o)(2)(A). DOE is expressly prohibited from setting "an amended or new standard … [that] will not result in significant conservation of energy or … is not technologically feasible or economically justified." *Id.* §6295(o)(3). In considering "whether a standard is economically justified," DOE must consider six criteria in addition to "other factors that [DOE] considers relevant." *Id.* §6295(o)(2)(B). In addition, §(o) has an anti-backsliding

provision that prohibits DOE from "prescrib[ing] any amended standard which increases the maximum allowable energy use … of a covered product." *Id.* §6295(o)(1). There is no equivalent prohibition for a "new" standard.

Subsection (q) establishes a "[s]pecial rule for certain types or classes of product." *Id.* §6295(q). That provision allows DOE to recognize new types or classes of products under two sets of circumstances: (1) if the products "consume a different kind of energy from that consumed by" equivalent products or (2) if the products "have a capacity or other performance-related feature which other products within such type (or class) do not have." *Id.* §6295(q)(1). Such new types/classes may have standards of "efficiency higher or lower than that which applies (or would apply) for such type (or class)." *Id.*

DOE may only recognize a new product class/type if it concludes that the new "capacity or other performance-related feature … justifies a higher or lower standard from that which applies (or will apply)." *Id.* §6295(q)(1)(B). Subsection (q) repeats the language that efficiency standards for new classes may be "higher or lower" a total of five times. *Id.* §6295(q)(1), (q)(1)(B) (twice), (q)(2) (twice).

In a nutshell, the Performance Rules concluded that DOE may create new classes of dishwashers and washing machines that each have a new "performance-related feature" (*i.e.*, faster cycle times) that "justif[y] a … lower standard from that which applies" under the prior applicable standards. *Id.* §6295(q)(1)(B). The Repeal Rule, in contrast, concludes that the Performance Rules violated the anti-backsliding provision of §(o)(1) and §(o)(2)(A), and therefore repealed the Performance Rules.

### *CEI Petition For Rulemaking*

In March 2018, DOE received a petition for rulemaking from the Competitive Enterprise Institute ("CEI"). 83 Fed. Reg. 17768, 17771-17777 (April 24, 2018). That petition requested "the issuance of [a] rule establishing a new product class under 42 U.S.C. 6295(q) that would cover dishwashers with a cycle time of less than one hour from washing through drying." Energy Conservation Program: Establishment of a New Product Class for Residential Dishwashers ("Dishwashers Final Rule"), 85 Fed. Reg. 68,723, 68,724 (Oct. 30, 2020).

A "'Normal cycle' is the cycle, including washing and drying temperature options, recommended in the manufacturer's instructions

for daily, regular, or typical use to completely wash a full load of normally soiled dishes, including the power-dry setting." *Id.* at 68,726. While dishwashers may have additional cycle options, "those additional cycles are not tested" for compliance with DOE's standards, nor are they considered the "Normal cycle" (which is presumably the one used most often). *Id.* The petition cited "the significant amount of consumer dissatisfaction" with the long "normal" cycle time of dishwashers currently on the market to support a finding that "cycle time is a 'performance-related feature' that provides substantial consumer utility." *Id.* at 68,724.

In response to the CEI petition, DOE began testing dishwashers available on the market, including a "review of normal and quick cycles" to determine the feasibility of manufacturing a dishwasher "with a cycle time of 60 minutes or less that could clean a full load of normally-soiled dishes" and whether such a class could be created "to incentivize manufacturers to fill that gap in the market." *Id.* at 68,725. DOE tested and compared several dishwasher models' performance on the "Normal" and "Quick" cycles, including their ability to properly clean dishes at three different soil loads. *Id.* DOE found that only a single unit was

capable of completing a cycle within 60 minutes that also met the ENERGY STAR program's standard "of a minimum per-cycle Cleaning Index of 70 for each soil load." *Id.* at 68,726 n.5. It further found that the only unit with a "Quick" cycle under 60 minutes that was recommended for normally soiled dishes by the manufacturer "had a weighted-average cleaning score of only 63," which is insufficient to meet the cleaning benchmark. *Id.* at 68,726.

These results drove DOE to conclude "that a dishwasher with a 'Normal' cycle time of 60 minutes or less is achievable and that establishing a product class where the 'Normal' cycle is 60 minutes or less could spur manufacturer innovation to generate additional product offerings to fill the market gap that exists for these products." *Id.* This "performance-related feature that other dishwashers currently on the market lack," is distinguishable from a "Quick cycle" because "these [Quick] cycles are often not intended for normal loads." *Id.*

### *Dishwasher Rule*

Based on its testing, DOE issued a notice of proposed rulemaking on July 16, 2019. 84 Fed. Reg. 33,869. DOE subsequently addressed comments it received arguing that cycle time could not be a

"performance-related feature" by demonstrating that its determinations were consistent with similar class definitions set for other appliances in the past. *Id.* at 68,727. These comments claimed that classes may only be based on differing consumer utilities and that the new class does not affect the "consumer utility of a dishwasher," which commenters claimed "is to clean dishes and other cookware." *Id.*

DOE disagreed, pointing to its previous determinations "that refrigerator-freezer configurations, oven door windows, and top loading clothes washer configurations all offer performance-related features that justified the creation of new product classes" even though these new classes of products all performed the same theoretical primary function (*i.e.*, chilling food, cooking food, and washing clothes, respectively). *Id.* Instead, in all of these cases, "DOE recognized that the value consumers received from the feature ... justified the establishment of the product class under 42 U.S.C. §6295(q)(1)." *Id.* For example, ovens with windows could be established as a distinct class with corresponding standards to address their increased energy use, and it did not matter that the "food would [also] come out cooked from an oven without a door window." *Id.*

DOE noted that "these contrary comments" conflict with the other

14

criteria Congress included "in EPCA for DOE to consider when using its discretion to identify the utility of a feature that justified the creation of a new product class—criteria that do not 'add to' the primary purpose of the product." *Id.* at 68,728. DOE reasoned that a contrary conclusion would have prevented it from accounting for consumer behavior—*e.g.*, opening oven doors and letting heat escape to check food doneness. The final rule further explained that it "d[id] not alter any existing energy or water conservation standards for dishwashers." *Id.*

This distinction—that creating a new product class is a separate action from amending standards—was a key premise of the final rule. *See id.* at 68,733-36. In particular, DOE noted instances in which it previously created new classes without concurrently setting efficiency standards; DOE did so for combination beverage vending machines in 2009 and distribution transformers in 2007. *Id.* at 68,733.

Prior to the 2009 change, combination vending machines were classed with all other beverage vending machines—either Class A or Class B—regardless of combination status. *Id.* But in 2009, "DOE recognized that combination vending machines had a distinct utility," effectively taking these items out of one or the other of the preexisting

classes in which they were previously placed to form a new class. *Id.* As with the Dishwashers Final Rule, DOE "decided to not set standards for the [new] equipment class at that time" and instead "reserved a place for the development of future standards," which ultimately occurred in 2016. *Id.* In 2007, DOE similarly "established a new product class without simultaneously ascribing an associated energy conservation standard" for distribution transformers. *Id.*

Following these precedents, DOE expressed its intent in the Dishwasher Rule to "conduct the necessary rulemaking … to determine the standards that provide the maximum energy efficiency that is technologically feasible and economically justified" for short-cycle dishwashers. *Id.*

The Dishwasher Rule also addressed EPCA's anti-backsliding provisions, 42 U.S.C. §6295(o), while noting that as it was not then setting any standard, "the commenters are assuming an outcome of an action DOE has yet to take." 85 Fed. Reg. at 68,736. DOE explained that the anti-backsliding "provision must be read in conjunction with the authority provided to DOE in 42 U.S.C. 6295(q) to specify 'a level of energy use or efficiency higher or lower than that which applies (or would

apply) for such type or class.'" *Id.* at 68,734. While emphasizing that its creation of a new class does not establish any standard, DOE examined the statutory language's use of present and future tense with regard to its ability to set a "higher or lower standard" to conclude that "EPCA authorizes DOE to reduce the stringency of the standard currently applicable to the products covered under the newly established separate product class." *Id.* at 68,735. It reiterated that "42 U.S.C. 6295(q) of EPCA cannot be read to prohibit DOE from establishing standards that allow for technological advances or product features that could yield significant consumer benefits while providing additional functionality (*i.e.*, consumer utility) to the consumer." *Id.* "DOE relied on this concept" in 2011 when it "established separate energy conservation standards for ventless clothes dryers," which were previously subject to the standards for all clothes dryers but were then permitted to operate in excess of the energy use standard with a waiver. *Id.* at 68,735-36.

DOE also repeated its statements from a 2016 furnace rulemaking that "tying the concept of a feature to a specific technology would effectively 'lock-in' the currently existing technology as the ceiling for product efficiency and eliminate DOE's ability to address such

technological advances." *Id.* at 68,735. It explained that "Congress crafted EPCA … to provide for the creation of new product classes with a level of energy use higher or lower than the product class as a whole … where the facts supported a differing standard." *Id.* at 68,736.

DOE thus rejected the notion suggested in some comments that the anti-backsliding standards provision, §(o)(1), would somehow control over the new-class-creation provision, §(q), simply because the former was newer. DOE thus concluded that "EPCA authorizes the Secretary to create such a product class [of short-cycle dishwashers], notwithstanding EPCA's anti-backsliding provision." *Id.* at 68,736.

DOE also addressed other comments and provided additional analysis on related subjects including the statutory provision prohibiting it from "establishing a standard that would result in the unavailability of a feature," §6295(o)(4), and concerns that manufacturers may have relied on the old standards for their research and development expenditures. 85 Fed. Reg at 68,736-38. DOE stressed that it was not creating a standard at that time, nor was it requiring any manufacturer to produce a product in the new class; it was leaving the existing standards, *i.e.*, those for the classes into which it virtually all

dishwashers currently on the market still fall, untouched. *Id*. The rule thus concluded that "DOE has … legal authority to establish a separate product class" for short-cycle dishwashers, did so, and expressed its intention to "consider energy conservation standards and test procedures for [the new short-cycle dishwasher] product class in a separate rulemaking." *Id*. at 68,738.

The Dishwashers Final Rule was challenged by various organizations and States, since consolidated in the Second Circuit. *NRDC v. DOE*, No. 20-4256 (2d. Cir.). Those challenges are stayed while this action challenging the Repeal Rule is pending. *Id*. Dkt. 109.

### *Washing Machine Rule*

In December 2020, DOE similarly promulgated a final rule establishing separate product classes "for top-loading consumer (residential) clothes washers and consumer clothes dryers that offer cycle times for a normal cycle of less than 30 minutes, and for front-loading residential clothes washers that offer cycle times for a normal cycle of less than 45 minutes." Energy Conservation Program: Establishment of New Product Classes for Residential Clothes Washers and Consumer Clothes Dryer, 85 Fed. Reg. 81,359-60 (Dec. 16, 2020). DOE believed

extant regulation "may have been precluding manufacturers from introducing models to the market with substantially shorter cycle times." *Id.* DOE asserted this shorter-cycle feature, in conserving users' time, was a performance-related and consumer-utility-enhancing feature justifying the creation of new product classifications under §6295(q)(1)(B). *Id.* at 81,364 (citing previously created classifications on the basis of "refrigerator-freezer configurations, oven door windows, and top loading clothes washer configurations").

DOE noted that shorter cycle time specifically sufficed in the past as a performance-related feature in creating new classifications. *Id.* (citing commercial clothes washers (77 Fed. Reg. 32,308, 32,319 (May 31, 2012)) and residential dishwashers (85 Fed. Reg. 68,723)). The newly-created product classes were, upon the effective date of that Rule, "not currently subject to energy or water conservation standards," which future rulemaking would set. *Id.* at 68,738.

### *Consumer Dissatisfaction*

The inadequacy of modern dishwasher and laundry machine performance, and high consumer dissatisfaction with it, is well-documented. Thousands of public comments to the Repeal Rule reflect

this. The Administrative Record includes CEI's survey of over 1000 consumers, highlighting the magnitude of this dysfunction-driven discontent. Over 85% of consumers report handwashing dishes "because the dishwasher takes too long." *CEI Comment* Attachment B at 3 ("*CEI Survey*"). Yet DOE recognizes that "hand washing dishes involves 140% the energy use and 350% the water usage of a dishwasher." *CEI Comment* at 4. And despite long run times, roughly 33% of consumers report that their dishwasher does not clean their dishes well. *CEI Survey* at 7. A similar 34% report that they run their dishwasher multiple times to get their dishes clean. *Id.* at 8.

Current dishwasher short cycles appear to perform even worse, with 43% of consumers whose dishwashers have a short-cycle option reporting the quick or express cycle does not sufficiently clean their dishes. *Id.* at 12-13.

### *Repeal Rule*

In August 2021, DOE published a notice of proposed rulemaking "to withdraw these short-cycle product classes." 87 Fed. Reg. 2,673; *see* 86 Fed. Reg. 43,970 (Aug. 11, 2021). DOE published the final Repeal Rule at issue on January 19, 2022. *Id.* The Repeal Rule described the

Performance Rules as "*replacing* an existing product class for standard size residential dishwashers with *two* new product classes based on cycle time." 87 Fed. Reg. at 2,676 (emphasis added).

The Repeal Rule asserts that the Performance Rules "amended the energy conservation standards for the short-cycle product classes by stating they were no longer subject to energy and water conservation standards." 87 Fed. Reg. at 2,677. The Repeal Rule asserts that DOE was, at the introduction of the Performance Classes, obliged to perform the analysis called for in 42 U.S.C. §6295(o)(2)(A), which concerns "any new or amended energy conservation standard prescribed." *Id.* at 2,678. The Repeal Rule characterizes the Performance Rules as having "amended" existing standards under "the plain meaning of the term 'amend.'" *Id.* The Repeal Rule additionally faults the Performance Rules for creating new product classes "not subject to any energy or water conservation standards without following 42 U.S.C. 6295(q)." *Id.*

The Repeal Rule asserts that the anti-backsliding provision bars the Performance Classes, specifically "that because Congress had set standards for residential clothes washers and residential dishwashers that DOE could not weaken those standards without considering EPCA's

anti-backsliding provision." *Id.* at 2,679. Despite being new classes, the Repeal Rule argues that the various Performance Class products would have been bound by the extant Long-Cycle standards, and thus the Performance Rules "did 'amend' the standards for these equipment classes and thus was required to satisfy the requirements in EPCA for issuing an amended standard." *Id.* at 2,680.

The Repeal Rule expressly disclaims making any challenge to "the validity of the determinations made [in the Performance Rules] about whether short cycles provide a 'performance-related feature' and 'utility.'" *Id.* at 2,682. The Repeal Rule instead argues that notwithstanding that unchallenged utility, the Performance Rules violated the anti-backsliding provision of §(o)(1) as well as §(o)(2)(A). *Id.*

DOE argues further that EPCA's "express purpose of energy and water conservation … would be thwarted if DOE could avoid restrictions on amending existing standards by nominally characterizing a regulatory change in the energy conservation standards applicable to a covered product as something other than an amendment." *Id.* at 2,683.

The States then filed this timely challenge to the Repeal Rule.

## SUMMARY OF THE ARGUMENT

The Repeal Rule is a policy disagreement dressed up as bad statutory interpretation. The Biden Administration obviously disagrees with the *policy* decision of its predecessor—*i.e.*, to give consumers additional choices—because Americans might use such enhanced choice to purchase appliances with greater performance but potentially lesser efficiency. But rather than engaging in rulemaking to change that policy decision itself, which is intentionally burdensome under the APA, DOE decided to effectuate a repeal of the Performance Rules on the cheap.

The Repeal Rule is thus not premised on a change in policy, but rather DOE's contention that the Performance Rules—which it had just adopted a mere 13-15 months prior after specifically concluding it had authority to issue them—were actually unlawful and beyond its authority. That putative lack of authority eliminates the need to consider any policy choices meaningfully: after all, if the Performance Rules were illegal, there is no real need to consider the policy option of retaining them under the APA. Instead, the prior rules could be terminated with little more than a legal brief explaining the agency's construction of

EPCA, under which the Performance Rules were unlawful in DOE's latest view.

The fundamental problem for DOE is that the Performance Rules comported fully with EPCA and prior DOE precedents, and DOE's current position (as opposed to their 13-months-prior position) squarely violates EPCA's text. The Repeal Rule's central premise that the Performance Rules violated EPCA cannot withstand judicial scrutiny, and DOE's attempt to circumvent the APA's requirements for policy making fails. Indeed, shorn of its what-we-just-said-13-months-prior-was-actually-totally-unlawful premise, what little that remains of the Repeal Rule cannot possibly suffice under the APA. Nor does it particularly matter since a rule "may not stand if the agency has misconceived the law." *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) (quotation marks omitted).

EPCA is perfectly clear that DOE can create new product classes *even if* they have lower efficiency. The Act thus provides an entire subsection (q), which establishes a "[s]pecial rule for certain types or classes of products." 42 U.S.C. §6295(q). Subsection (q)(1)(B) permits DOE to create new classes of products where they "have a capacity or

other performance-related feature which other products within such type (or class) do not have." §6295(q)(1)(B). When DOE does so, EPCA explicitly provides that the new class may have a "a higher *or lower* standard from that which applies (or will apply) to other products within such type (or class)." *Id.* (emphasis added).

The Performance Rules did *precisely* this: they (1) recognized new classes of dishwashers and washing machines that had a distinct "performance-related feature" (*i.e.*, faster cycle times) and (2) concluded that such features "justif[ied] a … lower standard." *Id.* In doing so, the Performance Rules unambiguously stayed within the four corners of subsection (q), and exercised authority that Congress gave DOE in the clearest possible terms. The Biden Administration may not like that *policy* determination, but the legality of the Performance Rules under EPCA's plain text is unassailable.

But the Repeal Rule attempts to refute this irrefutable conclusion, reasoning that the Performance Rules "amended the existing standards in violation of EPCA." 87 Fed. Reg. at 2,678. That is nonsense: subsection (q) expressly permits the creation of *new* classes, even where the products are subject to existing regulations. It thus expressly permits a standard

26

of "efficiency higher or lower *that which applies* (or would apply),"
§6905(q)(1)(B) (emphasis added)—thus explicitly contemplating that the
new product class would have previously been subject to prior standards
(*i.e.*, "that which applies (or would apply)"), and could now be subject to
a lower (or higher) standard.

DOE relies on the anti-backsliding provision of subsection (o),
which precludes DOE from "prescrib[ing] any *amended* standard which
increases the maximum allowable energy use." §6295(o)(1) (emphasis
added). But the Performance Rules do no such thing: they expressly leave
in place the existing standards for other dishwashers/washing machines
and create a *new*—not amended—class for the new Performance Classes.
For the prior standards, not one word was changed, nor comma moved,
or even date changed. The prior dishwasher/laundry standards thus
continued to exist, completely *un*amended, side-by-side with the new
Performance Rule standards.

The Performance Rule's standards are thus not "amended"
standards at all, and certainly not in *any* ordinary sense of the word.
Instead, at best for DOE, their reading of "amend" and "amended" is a
contrived and bizarrely stilted manner of linguistic usage that is a

creature of theoretical definitional possibilities, rather than how actual human beings communicate. DOE's construction is akin to describing the birth of a second child not as a "new arrival" but rather as an "amendment to the existing family structure." That is perhaps literally true, but ordinary humans (including members of Congress) do not talk that way. Indeed, it is doubtful that *anyone* not seeking to circumvent the APA (or otherwise pull a fast one) does. Notably, subsection (o) itself distinguishes expressly between "new" and "amended" standards, demonstrating that Congress did not believe the latter to include the former.

But even if DOE's reading of "amended" were conceivably permissible in a linguistic vacuum, it is not a defensible interpretation when the term is considered in context and under ordinary canons of interpretation. The plain text of subsection (q) alone precludes that reading since it explicitly and naturally permits what DOE artificially contorts subsection (o) to implicitly preclude.

Multiple canons of construction confirm that DOE's interpretation of subsection (o) is untenable. Five are particularly relevant here. *First*, it is a "'cardinal principle of statutory construction' that 'a statute ought,

upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted). DOE's newly minted interpretation renders the "or lower" language of subsection (q) a nullity, however. Nor is Congress's use of that "or lower" language accidental or stray language: Congress specifically used the "higher *or lower*" phrase *five separate times* in subsection (q), demonstrating its overwhelming intent that new product classes could, in fact, have *lower* efficiency standards. DOE's interpretation thus violates the anti-surplusage canon at least five times over.

*Second*, it "'is a commonplace of statutory construction that the specific governs the general.'" *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S 639, 645 (2012) (citation omitted). Here subsection (q) speaks specifically to the question at hand by answering whether a new product class may have a "lower" efficiency standard. It can, which Congress's quintuple use of the phrase makes manifest. In contrast, subsection (o) is a more general provision that applies to EPCA rulemaking broadly.

*Third*, the Repeal Rule fails to read "amended" in subsection (o) in context and in a manner that harmonizes it with subsection (q). Instead, DOE reads the former in a manner that conflicts with the latter and violates Congress's manifest purpose.

*Fourth*, "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (citations omitted). Notably, the title of subsection (o) is "Criteria for prescribing *new or amended* standards"—*i.e.*, both "new" *and* "amended." But the anti-backsliding provision of subsection (o)(1) applies only to "any *amended* standard"—not "new" ones. §6295(o). By excluding "new" standards from subsection (o)(1)—which both the title of subsection (o) and subsection (o)(2) include—Congress intended to avoid applying the anti-backsliding provision of (o)(1) to "new" standards, such as those putatively adopted (but actually deferred) by the Performance Rules.

*Fifth*, DOE misapprehends Congress's purposes and wrongly interprets EPCA in light of that misapprehension. The Repeal Rule repeatedly relies upon EPCA's "express purpose" as being only "energy

and water conservation." 87 Fed. Reg. at 2,683, 2,684, 2,686. But Congress's purposes were far broader and more balanced than that: expressly providing that DOE could set "lower" efficiency standard of a "performance-related feature … justifie[d] a … lower standard," §6295(q)(1)(B), and further mandated that DOE consider whether standards were "economically justified," §6295(o)(2)(A)—thereby demonstrating that furthering performance and economic goals were also part of Congress's balanced purposes, which the Repeal Rule simply ignores.

For all of these reasons, the Repeal Rule's construction of the EPCA—in which its application of the anti-backsliding rule of subsection (o)(1) trumps subsection (q) for "new" standards/classes—is wholly untenable and contravenes EPCA's unambiguous text (or, alternatively, is an unreasonable construction of whatever ambiguity exists).

The Repeal Rule has a backstop, but that too is untenable. Specifically, the Repeal Rule construes subsection (o)(2) in a manner that the Performance Rules are incompatible with, since they have not yet performed the analysis of what is "technologically feasible and economically justified." §6295(o)(2)(A). But EPCA does not require that

DOE establish efficiency standards at the same time that it creates new product classes. §6295(q). DOE's precedents are perfectly clear on this point—as both the Obama and George W. Bush Administrations recognized.

As described by DOE itself, "In the 2007 distribution transformers rulemaking, DOE established a separate equipment class for underground mining distribution transformers *without establishing associated energy conservation standards*." 87 Fed. Reg. at 2,679 (citing 72 Fed. Reg. 58,190 (Oct. 12, 2007) (emphasis added)). "Similarly, in the 2009 BVM [beverage vending machine] rulemaking, DOE established a separate equipment class for combination BVMs *without establishing associated energy conservation standards*." 87 Fed. Reg. at 2,679-80 (citing 74 Fed. Reg. 44,914 (Aug. 31, 2009) (emphasis added)).

DOE now attempts to *distinguish*—*i.e.*, not overrule—those precedents on the basis that the Performance Rules "did 'amend' the standards for these equipment classes and thus was required to satisfy the requirements in EPCA for issuing an amended standard." *Id.* at 2,680. But that rationale merely regurgitates DOE's misreading of the "amended" in subsection (o)(1). This rationale thus necessarily fails with

32

the rest of the Repeal Rule, because it contravenes EPCA and reads subsection (q)'s five-times repeated "higher *or lower*" language out of existence. Indeed, the text of subsection (q) unambiguously provides as much: DOE need only conclude that the new product class justifies "*a …  lower*" efficiency standard; there is no requirement whatsoever that the precise contours of that lower standard be established at that time.

In addition to conflicting with EPCA, the Repeal Rule also violates the APA because it is arbitrary and capricious. Three aspects stand out as APA transgressions. *First*, the Repeal Rule fails to set forth a defensible reason for departing from DOE's prior (correct) position that DOE may permissibly establish a new product class without concurrently setting efficiency standards for them. *Second*, DOE failed to consider adequately the reliance interests in the prior Performance Rules. *Third*, the Repeal Rule fails to supply any adequate reason for not simply establishing efficiency standards for the Performance Classes.

For all these reasons, this Court should vacate the Repeal Rule and thereby reinstate the Performance Rules.

## STANDARDS OF REVIEW

This Court reviews questions of statutory interpretation de novo. *In re Glenn*, 900 F.3d 187, 189 (5th Cir. 2018).

"[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

The Repeal Rule violates both EPCA—by misconstruing its terms—and the APA, by engaging in arbitrary-and-capricious rulemaking.

## I.    The Repeal Rule Violates EPCA

The Repeal Rule rests on interpretations of EPCA's terms that contravene its plain text and run afoul of multiple canons of construction. In the Rule, DOE adopts an interpretation of "amend" and "amended" for subsection (o) that does not make sense even when considering that

34

provision in isolation. Indeed, DOE's interpretation tellingly violates the agency's own cherry-picked dictionary definition in the Repeal Rule.

When considered together with subsection (q), however, DOE's interpretation becomes even more indefensible. Subsection (q) *explicitly* permits DOE to create new product classes with *lower* efficiency standards. Indeed, it repeats the "higher or lower" language *five times* in a manner that *should* have dispelled any relevant doubts. Moreover, subsection (q) expressly contemplates that products in the new classes might already have been subject to existing standards and nonetheless permits DOE to adopt "higher *or lower*" efficiency standards. That unambiguous language controls here, as several canons of construction confirm.

In addition, the Repeal Rule's premise that the Performance Rules violate subsection (o)(2)(A) because DOE has not yet set efficiency standards for the Performance Classes lacks merit. That contention rests on the same misreading of "amended" that violates EPCA. It further violates existing, undisturbed DOE precedent allowing for creation of new product classes *without* concurrently creating efficiency standards— which both the George W. Bush and Obama Administrations did in 2007

and 2009, respectively. Indeed, subsection (q) expressly only requires that DOE conclude that a new "performance-related feature … justif[y] *a* higher or *lower* standard," §6295(q)(1)(B) (emphasis added)—not establish at that particular time exactly how much higher or lower that standard be—which is undoubtedly why those 2007 and 2009 rules were uncontroversial (and unchallenged).

### A.    DOE's Conclusion That The Performance Rules Run Afoul Of The Anti-Backsliding Provision (§(o)(1)) Violates EPCA

At its base, the Repeal Rule rests on an interpretation of "amend"/"amended" in EPCA that violates its plain meaning, squarely contravenes subsection (q), and violates multiple canons of construction.

#### 1.    The Plain Text Of Subsection (o) Alone Precludes DOE's Construction Of "Amend"

Even looking at subsection (o) in isolation, DOE's construction of "amend" and "amended" cannot withstand scrutiny. The pre-existing standards for dishwashers and washing machines continue to exist and govern for all such appliances that do not fall within the Performance Classes. *Not one word* of those prior standards has been changed in any way. They continue to endure as operative standards for Legacy Classes,

completely unaltered, but now exist side-by-side with the Performance Classes.

These prior standards thus have not been "amended" by the creation of a new class. Nor are the Performance Class standards "amended" standards, since they are wholly novel creations that did not exist previously.

Those conclusions follow naturally from the ordinary definitions of "amend." Black's Law Dictionary, for example, defines it as either "To correct or make usu[ally] small changes to" or "change the wording of; specif[ically], to formally alter (a statute, constitution, motion, etc.) by striking out, inserting, or substituting words," giving as an example "amend the legislative bill." AMEND, Black's Law Dictionary (11th ed. 2019).

But the Performance Rules do no such thing. They do not make "changes to" the preexisting Legacy Class standards—small or large— and do not "change the wording" of them either. Instead, they create new classes to which new standards will apply, while leaving the existing standards entirely unamended.

Notably, DOE's interpretation fails under even its own handpicked dictionary definition. Specifically, the Repeal Rule seizes upon American Heritage Dictionary's definition for "amend": "to 'alter *formally* by adding, deleting or rephrasing.'" 87 Fed. Reg. at 2,678 (quoting American Heritage Dictionary 42 (3d ed. 1981) (emphasis added)). But the Performance Rules do no such thing: they leave the existing standards in place, entirely unaltered, line-by-line, word-for-word, and comma-by-comma.

Instead, DOE's true complaint is that the Performance Rules *constructively* or *implicitly* modify those existing Legacy Class standards, because they "remov[e] the standards applicable to those products." *Id.* But "constructively" or "implicitly" altering the standards is the antithesis of "formally" modifying them—and only formal modification suffices under DOE's own cherry-picked dictionary definition (and the agency does not cite any others).

*Nothing* about the existing dishwasher/washing machine standards themselves has actually changed as a formal matter. Strictly speaking, what actually has been "amended" is the product classes/classifications— *i.e.*, not standards themselves—which then drive what the applicable

standards will eventually be. But the prior standards themselves have not been "amended" at all, and certainly not formally.

DOE further resorts to mischaracterization to bolster its statutory interpretation, contending that the Performance Rules "clearly fit[] within this scope of the definition of 'amend' because DOE *deleted* the applicable standards *altogether*." 87 Fed. Reg. at 2,678 (emphasis added). But not one applicable word in the C.F.R.s has actually been "deleted"—let alone a full-blown deletion "altogether." For all Long-Cycle dishwashers and washing machines, the exact same standards continue to apply with not one word "deleted." And when the specific Performance Class standards are promulgated they will not delete *any* words of the prior standards either, let alone all of them.

Again, DOE's point appears to be that the Performance Rules have constructively "deleted" the pre-existing standards with respect to the Performance Classes, by creating the new classes with new standards that will be applicable to them. But once more, "constructively" altering something is the opposite of altering it "formally." And only the latter suffices under the dictionary definition adopted by DOE itself.

A simple historical example demonstrates the absurdity of DOE's interpretative arguments. Under the agency's instant construction, the U.S. Constitution is actually a mere "amended" version of the Articles of Confederation, rather than a replacement of it. Under DOE's expansive view of "amended," the Constitution "remov[ed] the standards applicable" to the governance of the ratifying States (*i.e.*, the Articles), thereby "amending" them. 87 Fed. Reg. at 2,678.

But that the Constitution would *replace* the Articles with a *new* governing document, rather than merely amending them, was one of the central and foundational decisions of the Constitutional Convention, and indeed the Constitution itself. But under DOE's sprawling construction of "amended," the delegates were merely "amending" the Articles the whole time, and the Constitution persists to this day as an amended version of the Articles.

That the meaning of "amended" is not nearly as broad as DOE believes is confirmed by the text of subsection (o) itself. The title of the section specifically refers to both "new *and* amended standards," demonstrating that "new" is distinct from "amended," and the latter is necessarily not so broad that it swallows the former, rendering it

40

superfluous. That is confirmed by the fact that subsection (o)(2)(A) also uses "new or amended" but subsection (o)(1)—*i.e.*, the anti-backsliding provision—applies only to "amended," and not "new," standards. That omission is presumptively intentional. *See, e.g., Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted).

DOE, however, reads "amended" in subsection (o)(1) so broadly that it applies to "new" standards—*i.e.*, the new standards applicable to the Performance Classes. In doing so, DOE's reading of "amended" necessarily contravenes Congress's intended meaning, and thereby violates EPCA.

**2.    The Text Of Subsection (q) Also Squarely Precludes DOE's Interpretation**

Even if DOE's interpretation of "amended" was defensible when considering subsection (o) in isolation, it quickly becomes untenable when considering it when read in conjunction with subsection (q). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (citation omitted). Indeed, "Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings *produces a substantive effect that is compatible with the rest of the law.*" *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (cleaned up) (emphasis added).

By its plain terms, subsection (q) explicitly and unambiguously permits DOE to create new product classes with *lower* efficiency standards. As long as the new class either "consume[s] a different type of energy" or "ha[s] a capacity or other performance-related feature" as compared to existing types/classes, then DOE is explicitly permitted to "specify a level of energy use or efficiency higher *or lower* than that which [otherwise] applies (or would apply)." §6295(q)(1) (emphasis added).

This "or lower" text is no mere stray language: Congress used the phrase "higher *or lower*" *five separate times* in subsection (q), providing overwhelming evidence of its intent that new product classes could

indeed create new product classes with *lower* efficiency standards. §6295(q).

By applying the anti-backsliding provision of subsection (o)(1) to the Performance Rules because there are existing standards for dishwashers and washing machines, DOE's interpretation directly conflicts with subsection (q). Under DOE's most-recent construction, DOE does not have the power to create new product classes with lower efficiency standards at all, since the anti-backsliding provision of subsection (o)(1) prohibits it under DOE's reading of "amended."

But this result merely confirms that DOE's reading is necessarily wrong since it "produces a substantive effect that is [not] compatible with the rest of the law." *Timbers*, 484 U.S. at 371. That patent incompatibility demonstrates that "amended" in subsection (o) does not mean what DOE reads it to mean. That is true even if "amended," considered in a linguistic vacuum, might literally be capable of possessing the meaning that DOE believes it does: "A word in a statute may *or may not* extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities

43

that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (emphasis added).

Thus, even if the outer limits of the meaning of "amended" might distend so far as to include DOE's construction under one of its literal definitions, here the relevant statutory text and purpose preclude "amended" stretching to those limits here. (Tellingly "amend" does not even possess such "outer limits" under DOE's own cherry-picked dictionary definition, however. *Supra* at 38.) Ultimately, "Ambiguity is a creature not of definitional possibilities but of statutory context." *Brown,* 513 U.S. at 118. Here that context unambiguously precludes DOE's interpretation.

The untenable nature of DOE's interpretation is further confirmed by (q)(1)'s language that DOE may adopt a standard of "efficiency higher or lower *than that which applies (or would apply)* for such type (or class)." §6295 (q)(1). In doing so, Congress expressly contemplated that the products might already be subject to *existing* efficiency standards—*i.e.,* that there would be another standard "which applies (or would apply)" already. *Id.* But even where there are such existing standards, Congress nonetheless chose to let DOE adopt a standard of "efficiency higher *or*

*lower.*" *Id.* Congress thus necessarily rejected DOE's reading of "amended," under which DOE effectively can only create new classes with higher, and not lower, efficiency standards.

Another simple example suffices to show the absurdity of DOE's interpretation. Suppose appliance makers invented a new type of laundry washing machine that could clean even "dry clean only" garments in addition to ordinary clothes, but consumed 2% more electricity than the existing DOE efficiency standards for Legacy Classes. Under DOE's interpretation that prevailed up until the Repeal Rule, the agency would be amply empowered to create a new product class for such machines, concluding that they "have a … performance-related feature which other products within such type (or class) do not have … [which] justifies a … lower standard." §6295(q)(1)(B).

But under the Repeal Rule's interpretation, DOE could do no such thing. Because such washing machines could also clean machine-washable clothes, they would be governed by the existing standards and creating the new product class would constitute, in DOE's view, "removing the standards applicable to those products," and thereby "clearly fit[] within this scope of the definition of 'amend.'" 87 Fed. Reg.

45

at 2,678. Under that reading, subsection (o)(1) would forbid the new product class—no matter how much utility it would bring and how much consumers might love it—because the 2% reduction in energy efficiency violates the anti-backsliding mandate. *Id.* Thankfully, EPCA— particularly under subsection (q)—does not actually mandate that ludicrous result.

### 3.    The Applicable Canons Of Construction Confirm That The Repeal Rule Violates EPCA

The applicable canons of statutory interpretation also support Petitioner States and render the Repeal Rule untenable for five reasons, many of which have already been discussed above.

*First*, the Repeal Rule's construction of EPCA violates the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc.*, 534 U.S. at 31 (citation omitted). Under DOE's interpretation, the "or lower" language of subsection (o) is a nullity since DOE cannot actually set a lower efficiency standard for any new product class carved out of an existing class. *Supra* §I.A.1-2. It does so even though subsection (q) expressly contemplates that the product might already be subject to an existing

standard and DOE can nonetheless set a "higher or lower" efficiency standard. Nor is this a minor violation of the anti-surplusage canon: subsection uses the "higher or lower" phrase *five separate times*, and DOE nullifies *all* of those uses. *Supra* at 10.

*Second*, the Repeal Rule violates the "commonplace of statutory construction that the specific governs the general.'" *RadLAX Gateway Hotel*, 566 U.S at 645. While subsection (o)(1) addresses amended standards generally, subsection (q) directly and *specifically* answers whether DOE can conclude that a "lower" efficiency standard is "justif[ied]" by a "performance-related feature." §6295(q)(1)(B). It can.

Notably, the "general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel*, 566 U.S at 645. That is just so here: subsection (o)(1) is a general prohibition (to the extent that it applies at all), while subsection (q) is explicit and specific permission to create new classes with lower efficiency standards based on new performance features. Thus, to the extent that there is any tension at all

between subsections (o) and (q), (q) controls as the more specific provision.

That result is particularly appropriate as subsection (q) is titled "*Special rule* for certain types or classes of products," §6295(q) (emphasis added)—suggesting that the rule is "special" and departs from rules that might apply elsewhere, such as the general anti-backsliding rule. *See Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) ("'[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.'" (citation omitted)).

*Third*, the Repeal Rule improperly reads subsection (o) in isolation rather than attempting to harmonize it with subsection (q). "Statutory language … 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted). Accordingly, this Court's "task is to fit, if possible, all parts into an harmonious whole.'" *Id.* at 100. The States' interpretation and that of the Performance Rules does just that, harmonizing subsections (o) and (q) in a manner that gives effect to both. The Repeal Rule, in contrast,

reads them like "pebbles in alien juxtaposition," *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (quotation marks omitted), artificially reading subsection (o) in a manner that eviscerates subsection (q).

*Fourth*, "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin*, 134 S. Ct. at 2390 (citations omitted). While subsection (o)'s title and subsection (o)(2) both speak of "new and amended" standards, subsection (o)(1) applies only to "any *amended* standard"—not "new" ones. §6295(o) (emphasis added).

But DOE now gives no effect to that excluded language, and interprets "amended" in a manner that is identical to "new and amended" elsewhere. By excluding "new" standards from subsection (o)(1), Congress intended to exclude rules such as the Performance Rules that create new classes/standards. The Repeal Rule thus improperly ignores Congress's intentional exclusion of "new" in that provision.

*Fifth*, DOE violates the canon that "[s]tatements of purpose by their nature 'cannot override a statute's operative language.'" *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) (cleaned up). Here DOE both

misapprehends Congress's purposes by artificially limiting them and further allows purpose to trump operative language.

The Repeal Rule repeatedly relies upon EPCA's "express purpose" as being only "energy and water conservation," and then argues that this purpose "would be thwarted" if the interpretation of the Performance Rule—*i.e.*, that DOE can adopt new product classes with greater performance but lower efficiency standards—were retained. 87 Fed. Reg. at 2,683; *accord id.* 2,684 (same rationale); 2,686 (repeating same twice).

But Congress was not nearly so monomaniacal as DOE believes. Instead, subsection (q) explicitly recognizes another purpose: balancing energy efficiency concerns with performance, and expressly permitting DOE to adopt new classes with *lower* efficiency standards as long as the "feature justifies a … lower standard." §6295(q)(1)(B). Moreover, subsection (o) itself—upon which DOE's interpretation overwhelmingly relies—expressly *mandates* that DOE consider not merely energy efficiency but whether the standard is "economically justified." Subsection (o)(4) further prohibits DOE from "establishing a standard that would result in the unavailability of a feature." §6295(o)(4). All of these provisions demonstrate that Congress's purposes were far more

50

balanced and much less myopic than DOE perceived them to be. §6295(o)(2)(A).

DOE thus has misread Congress's purposes. But even if DOE had correctly divined them, "vague notion[s] of the statute's 'basic purpose' are ... inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Montanile v. Bd. of Tr. of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 661 (2016) (cleaned up). And that is precisely what DOE has done here, allowing its distorted view of what EPCA's "express purpose" is to supplant what subsection (q) actually says.

The Supreme Court has aptly observed that the "last redoubt of losing causes is the proposition that the statute at hand should be liberally construed to achieve its purposes." *Director, Office of Workers' Compensation Programs, Dept. of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995) (cleaned up). So it is here.

### B.    *Chevron* Deference Cannot Save The Repeal Rule

Given the precariousness of its interpretation, DOE will undoubtedly attempt to rely on *Chevron* deference to save its Repeal Rule. That predictable effort will be unavailing.

As set forth above, EPCA *unambiguously* authorizes DOE to create new product classes with lower efficiency standards and thus unequivocally precludes DOE's belated interpretation (and vindicates its 13-months-prior construction). *Supra* §I.A. Because "Congress has 'directly spoken to the precise question at issue,' ... 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (quoting *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-44 (1984)).

The lack of ambiguity is particularly apparent here because a finding of ambiguity can only be made *after* "employing traditional tools of statutory construction," including canons of construction. *Chevron*, 467 U.S. at 843 n.9. This Court thus "owe[s] [DOE's] interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' [it] find[s] [it]sel[f] unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358, 200 L. Ed. 2d 695 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9)). Thus, "[w]here, as here, the canons [of interpretation] supply an answer, '*Chevron* leaves the stage.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).

Notably, the Repeal Rule fails to apply meaningfully any of the canons of construction discussed above and even runs afoul of its own handpicked dictionary definition. Because EPCA unambiguously precludes DOE's interpretation of "amend"/"amended" that the Repeal Rule overwhelmingly relies upon, this Court's *Chevron* inquiry ends at step one, and no deference applies. Indeed, *Chevron* has not merely "le[ft] the stage" here, *id.*, but departed the building altogether.

Moreover, even if any ambiguity remains, DOE's interpretation is an unreasonable interpretation of EPCA, particularly as it is fundamentally incompatible with the plain text of subsection (q), which explicitly *five times over* permits what DOE reads EPCA to prohibit. *Supra* at 10.

## C. The Performance Rules Permissibly Deferred Establishment Of Specific Efficiency Standards

DOE's conclusion that the Performance Rules violate subsection (o)(2)(A) because they do not yet set specific efficiency standards, 87 Fed. Reg. at 2,677-78, is similarly untenable. In particular, that conclusion explicitly rests on the same flawed construction of "amended," contending that the Performance Rules "did 'amend' the standards for these equipment classes and thus was required to satisfy the requirements in

EPCA for issuing an amended standard." 87 Fed. Reg. at 2,280. But that is simply the same misreading of "amend" that fails for the reasons explained above. *Supra* §I.A. The Performance Rules did no such "amending." *Id.*

That rationale similarly violates the plain text of subsection (q), which expressly permits DOE to conclude that a new "performance-related feature … justifies *a* … lower standard" without requiring the agency to establish that lower standard at that time. §6295(q)(1)(B). That provision then further provides that "[i]n making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate," *id.*— again not requiring that DOE set any particular standard, but only requiring that DOE justify whether *a* lower (or higher) efficiency standard is warranted.

That result is underscored by the repeated use of the indefinite article "a" in "*a* … lower standard" rather than a definite article "the." "The standard" would have strongly suggested that DOE needs to

create/justify a specific standard for the new classes at the same time it creates those new product classes. *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that 'the' is a function word indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context." (cleaned up)).

In contrast, Congress's double use of the indefinite article "a" merely requires that DOE justify that *some* indefinite "lower" standard is justified. *See*, *e.g.*, *McFadden v. United States*, 576 U.S. 186, 191 (2015) ("When used as an indefinite article, 'a' means "*some undetermined or unspecified particular.*'" (quoting Webster's New International Dictionary 1 (2d ed. 1954) (alteration omitted) (emphasis added)). The use of the indefinite article indicates that the specific standards can remain indefinite at the time the new product classes are created.

That DOE need not set new standards for new product classes at the same time it creates the new product classes is confirmed by venerable DOE precedents. As DOE itself acknowledges, the agency did just that in 2007 for underground mining distribution transformers and again in 2009 for combination vending machines. 87 Fed. Reg. at 2,679. DOE continues to adhere to both precedents, which remain good law. But

the agency nonetheless attempts to distinguish the Performance Rules because there were existing product standards for dishwashers and washing machines, which continue to remain in place of the Long-Cycle Classes. 87 Fed. Reg. at 2,680, 2,684.

But that reasoning is simply a repackaging of DOE's misinterpretation of the anti-backsliding rule as precluding any lower standards. As noted above, DOE is perfectly clear that this reasoning is explicitly premised on the *exact same* reading of "amend"/"amended" in subsection (o): contending that the Performance Rules impermissibly "*amended* the existing standards in violation of EPCA." 87 Fed. Reg. at 2,678 (emphasis added). The problem for DOE is that "amended" in EPCA does not mean what it thinks that word means, and the Performance Rules do not "amend" anything or create any "amended" standards. *Supra* §I.A.

*    *    *

Because DOE's interpretation of subsection (o)(2)(A) rests on the same erroneous reading of "amended" as its construction of subsection (o)(1), DOE's conclusion that the Performance Rules violate §(o)(2)(A)

also fails for all of the reasons set forth above, and does not provide any independent basis for sustaining the Repeal Rule.

## II.     The Repeal Rule Is Arbitrary And Capricious

Even if the Repeal Rule did not violate EPCA, it still should be set aside because it violates the APA by engaging in arbitrary-and-capricious decision-making.

### A.     The Repeal Rule Fails To Explain Adequately DOE's Change In Policy

Until the Repeal Rule, DOE had repeatedly taken the position that it could create new product classes without simultaneously creating new efficiency standards for them—doing so in three successive Administrations: in 2007 and 2009, and twice again in 2020 with the Performance Rules. The Repeal Rule abruptly upends that longstanding interpretation, by repealing the Performance Rules on the basis that they contravened EPCA.

"[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 41-42. "In such cases … a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered

by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009) (citations omitted). "Reasoned decision making, therefore, necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent. Applying the corollary of this requirement, 'agency action is arbitrary and capricious if it departs from agency precedent without explanation.'" *Dillmon v. Nat. Transp. Safety Bd.*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009) (citation omitted).

The reasoning that DOE supplies in the Repeal Rule for departing from its 2007/2009/2020 precedents is simply too flimsy to survive under that standard for three reasons.

*First*, DOE never meaningfully grapples with the consequences that inexorably flow from its upending of its prior interpretations. Under DOE's current reasoning, DOE may *never* create a new product class with a lower efficiency standard if the product is already governed by existing standards. In other words, no new performance feature—no matter how useful or beloved by consumers—could ever justify *any* decrease in energy efficiency, apparently ever. EPA thus could not approve the hypothetical new class of washing machines that could wash dry-clean-

only clothes but are 2% less energy efficient. *Supra* at 45. Nor could it approve a new class of air conditioners that is 1% less efficient but effectively filters out 99.99% of COVID-19 virus particles and other pathogens.

Indeed, the Repeal Rule makes this effect perfectly clear when it explains that DOE is "*not* contending [*i.e.*, contesting] in this rulemaking the validity of the determinations made about whether short cycles provide a 'performance-related feature' and 'utility.'" 87 Fed. Reg. at 2,682 (emphasis added). The Repeal Rule thus accepts that the Performance Classes have new features with actual utility; it just regards that greater utility as categorically irrelevant.

That is a radical position with radical consequences. But DOE never acknowledges these inescapable consequences and thus fails to provide an adequate explanation either for changing its position or for adopting the construction that it did.

*Second* and relatedly, DOE never adequately addresses Congress's overwhelming intent to confer upon DOE authority to balance performance against efficiency when deciding whether or not to create new *classes* of products. Congress could not have been clearer on this:

using the "higher *or lower*" language *five* separate times in subsection (q). But DOE's interpretation replaces Congress's explicit and repeated intent that there be a *balancing* of performance and efficiency with a one-way ratchet in which no level of efficiency can ever justify *any* lower efficiency standard if the product were ever previously subject to one. In doing so, DOE has "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43—*i.e.*, the need to consider trade-offs rather than blindly and inerrantly applying a one-way ratchet.

DOE's contrary argument is unavailing. While expressly not disputing the Performance Classes "provide a 'performance-related feature' and 'utility,'" it reasons the Performance Rules must be repealed because "the appropriate occasion for conducting the 42 U.S.C. 6295(q) analysis is in a rulemaking prescribing new or amended standards." 87 Fed. Reg. at 2,682. But that *categorical* reasoning squarely contradicts DOE's prior, unaltered precedents that DOE *may* establish classes "without establishing associated energy conservation standards." *Supra* at 15-16, 32. If DOE actually believes this new rationale, it was obliged to overturn those prior precedents rather than merely distinguishing them with reasoning fundamentally incompatible to their premises.

*Third*, the quality of the Repeal Rule's interpretative analysis is extraordinarily poor, and thus does not suffice under the APA. *See*, *e.g.*, *National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 (2005) (explaining that while agencies may change their statutory interpretations, they must do so "within the limits of reasoned interpretation" and "adequately justif[y] the change").

For example, the Repeal Rule only cites a single, handpicked dictionary definition, which squarely *contradicts* DOE's reasoning. *Supra* at 38. While perhaps not quite as embarrassing as losing an argument to one's own strawman, being trounced by one's own cherry-picked definition is pretty bad.

Similarly, the Repeal Rule does not meaningfully perform any of the analysis of canons of construction set forth above. Nor does it address the fact that EPCA repeatedly uses the phrase "new or amended" repeatedly throughout its text but uses only "amended" for subsection (o)(1). *Supra* at 30. Instead, DOE sought shelter in the "last redoubt of losing causes"[1] by attempting to trump text with purported purpose—

---

[1] *Newport News,* 514 U.S. at 135.

61

which DOE has misread in any event by failing to recognize Congress had much more balanced goals than the tunnel vision that DOE ascribes to it. *Supra* at 49-51.

All of these omissions are particularly striking as the Repeal Rule's entire *raison d'être* is that the Performance Rules were *unlawful*, rather than unwise policy. If DOE is going to put statutory interpretation front and center in a rule, it could at least attempt to perform that interpretive inquiry in an analytically rigorous manner.

But the Repeal Rule simply doesn't. Instead, its interpretive analysis is not close enough even for government work. *See also supra* §I.

## B.    DOE Failed To Consider Reliance Interests Adequately

"When an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citation omitted)). "It would be arbitrary and capricious to ignore such matters." *Id.*

The Repeal Rule undeniably "changes course"—repealing rules issued just 13 and 15 months prior. But it fails to consider reliance

interests in the Performance Rules adequately, and thus violates the APA.

The word "reliance" only appears once in the Repeal Rule, and DOE offers all of two sentences addressing reliance interests:

> DOE is not aware of any residential dishwashers, residential clothes washers, or consumer clothes dryers that are certified and sold as short-cycle products at this time. DOE considers the lack of products on the market classified under the short-cycle product definitions and the short time period between 2020 Final Rules and the proposed revocation of those rules by the August 2021 NOPR to indicate a lack of reliance by stakeholders on the short-cycle product class definitions revoked in this final rule.

87 Fed. Reg. at 2,686.

This threadbare rationale does not suffice. As an initial matter, the "short time period" does *not* preclude significant reliance interests from existing. In *Regents*, DHS specifically argued that "DACA recipients ha[d] no 'legally cognizable reliance interests' because … the program … *provided benefits only in two-year increments*." 140 S. Ct. at 1913 (emphasis added). And lost. Instead, the Supreme Court expressly held that the short-term nature did *not* "automatically preclude reliance interests."

Here the time period at issue—13-15 months between the Performance Rules and the Repeal Rule—is not much shorter than the two-year periods at issue in *Regents*. DOE's conclusion that the "short time period" alone categorically "indicate[s] a lack of reliance" interests thus squarely violates *Regents*.

In addition, while DOE addressed whether any Short-Cycle Products were certified and currently on the market, it failed entirely to consider whether any manufacturers might currently be *developing* such products, only for the Repeal Rule to pull the rug out from under them mid-development. In doing so, DOE failed to address a thoroughly obvious potential reliance interest.

Similarly, DOE also failed to consider whether any consumers might have been relying on the Performance Rules and future availability of Performance Class products, and therefore postponing purchasing decisions. That too would constitute reliance interests that were disrupted by the Repeal Rule. DOE's failure to address these reliance interests also dooms the Rule.

In the end, DOE's two sentences both fail to satisfy the agency's burden under the APA and squarely violate *Regents*, by treating the short

life of the Performance Rules as necessarily preluding any reliance interests from existing.

### C. The Repeal Rule Fails To Supply An Adequate Rationale For DOE's Refusal To Create Specific Standards For Performance Classes

DOE appears to concede that it could avoid repealing the Performance Rules by instead promulgating standards for the Performance Classes: admitting "DOE could propose new standards for short-cycle products—as certain commenters suggested." 87 Fed. Reg. at 2,683. As an initial matter, this appears to contradict DOE's determination that the anti-backsliding provision of subsection (o)(1) precludes any lower standards for new product classes if they were ever subject to prior classes. That contradiction is strange, and itself likely fatal.

In any event, DOE "declined" to create standards "at this time" for three reasons: "(1) The time and resources that it would entail to develop these new standards in relation to other obligations of the program, (2) the lack of presently-available data that would be necessary to analyze the short-cycle product classes and establish new standards for

these class, and (3) the absence of new products on the market that would fall within these new product classes." *Id.*

None of these reasons suffice. Taking the third one first, DOE shows a remarkable lack of self-awareness. The reason that there are not "new products on the market" at this time is undoubtedly because the current DOE Administration made manifest its implacable antipathy to the Performance Rules in the Repeal Rule's notice of proposed rulemaking. 86 Fed. Reg. 43,970.

Having actively taken steps to ensure that such products would not be developed, it is more than a little rich for DOE to now rely upon the lack of such products on the market to justify the result it had already effectuated itself. Indeed, this rationale "calls to mind the man sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan." *Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring). DOE cannot *de facto* procure an outcome and then rely on its success in doing so to justify what it had already accomplished, all the while ignoring its own role in ensuring that the intended result came to pass.

DOE's second rationale—"lack of presently-available data"—fares little better. Notably, DOE acknowledges in the *very next paragraph* that "many residential dishwashers, residential clothes washers, and consumer clothes dryers offer shorter cycle options on models already available to consumers." 87 Fed. Reg. at 2,683. DOE fails to supply any reason why it could not use data from those appliances to establish Performance Class standards. (DOE might be intimating that the existence of such "shorter cycle options" on existing models diminishes the utility of the new Performance Classes—but it expressly disclaims elsewhere disturbing "the validity of determinations made [by the Performance Rules] about whether short cycles provide a 'performance-related feature' and 'utility.'" 87 Fed. Reg. at 2682.)

Finally, DOE's first rationale of "time and resources" required is entirely conclusory, without even a scintilla of detail provided. Merely "'[s]tating that a factor was considered ... is not a substitute for considering it." *Texas v. Biden*, 20 F.4th 928, 993 (5th Cir. 2021) (citation omitted), *rev'd on other grounds* 2022 WL 2347211 (U.S. 2022). Nor can an agency's "failure to consider the regulatory alternatives ... be substantiated by conclusory statements." *Corrosion Proof Fittings v.*

*EPA*, 947 F.2d 1201, 1226 (5th Cir. 1991). And here DOE's assertion that the amount of time and resources required to establish standards is unwarranted is entirely conclusory.

## III.  This Court Should Vacate The Repeal Rule

Vacatur is the appropriate remedy for DOE's violations of EPCA and the APA here. Nor is there any basis to question the States' standing in this case.

### A.    The States Have Article III Standing To Bring This Challenge

As set forth in the declarations concurrently filed with this brief, the States frequently purchase dishwashers and washing machines affected by the Performance and Repeal Rules. They accordingly have standing to challenge the Repeal Rule, since it artificially and unlawfully constrains the choices of appliances that the States can purchase. Indeed, "the lost opportunity to purchase a desired product constituted an injury-in-fact sufficient to confer Article III standing." *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857–58 (D.C. Cir. 2021) (collecting cases).

The States also have standing due to proprietary injury. Consumers have made plain their desire to have access to Performance Class appliances. *Supra* at 20-21. If even one of those consumers would have

purchased a new machine as a result of the Performance Rules in the Petitioner States, they would necessarily pay sales tax to the state in which the purchase would have been made. (All 12 Petitioner States have sales taxes.) Similarly, consumers have made clear that they would pay more for Performance Class products, which would also enhance sales tax revenue. *Supra* at 20-21. This diminished tax revenue is cognizable proprietary injury conferring Article III standing. *Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992).

Standing requirements are also *doubly* relaxed here. They are first relaxed because the States are asserting "procedural right[s] to protect [their] concrete interests." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992) (observing that "[t]here is this much truth to the assertion that 'procedural rights' are special"). The States can thus assert their procedural rights under the APA "'without meeting all the normal standards for redressability and immediacy.'" *Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) (quoting *Lujan*, 504 U.S. at 573 n.7).

Standing requirements are relaxed a second time here because States are "entitled to special solicitude" under courts' standing analysis.

*Id.* at 520; *accord Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015) *aff'd by an equally divided court* 136 S. Ct. 2271 (2016).

## B.   Vacatur Is The Appropriate Remedy Here

This case provides no basis to depart from "the ordinary practice [which] is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Indeed, "vacatur is the default remedy to correct defective agency action." *National Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019).

DOE's violations of EPCA are incurable, since the agency has no ability to alter EPCA's text on remand. Similarly, vacatur is warranted as "the seriousness of the order's deficiencies" is substantial and there are no obvious "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51(D.C. Cir. 1993).

That consumers might, post-vacatur, have greater choice in appliances whose performance is not pervasively and intentionally middling is good reason not to depart from the default remedy here.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Repeal Rule, and thereby reinstate the Performance Rules.

Dated: September 2, 2022

Respectfully submitted,

**MARK BRNOVICH**
**ATTORNEY GENERAL**

s/ Drew C. Ensign

Joseph A. Kanefield
*Chief Deputy & Chief of Staff*

Drew C. Ensign*
  *Deputy Solicitor General*
Anthony R. Napolitano

Brunn ("Beau") W. Roysden III
  *Solicitor General*

Robert J. Makar
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, AZ 85004

\*  Counsel of Record

Phone:     (602) 542-5025
Fax:       (602) 542-4377

*Counsel for the State of Arizona*

**ALSO SUPPORTED BY:**

STEVE MARSHALL
*Alabama Attorney General*

JOHN M. O'CONNOR
*Oklahoma Attorney General*

LESLIE RUTLEDGE
*Arkansas Attorney General*

ALAN WILSON
*South Carolina Attorney General*

DANIEL CAMERON
*Kentucky Attorney General*

HERBERT H. SLATTERY III
*Tennessee Attorney General*

JEFF LANDRY
*Louisiana Attorney General*

KEN PAXTON
*Texas Attorney General*

ERIC S. SCHMITT
*Missouri Attorney General*

SEAN D. REYES
*Utah Attorney General*

AUSTIN KNUDSEN
*Montana Attorney General*

71

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 12,968 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).


s/ Drew C. Ensign
Drew C. Ensign

## CERTIFICATE OF SERVICE

I, Drew C. Ensign, hereby certify that I electronically filed the foregoing Corrected Brief for Petitioners in with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on September 2, 2022, which will send notice of such filing to all registered CM/ECF users.

s/ Drew C. Ensign
Drew C. Ensign

**No. 22-60146**

In the United States Court of Appeals
for the Fifth Circuit

STATES OF LOUISIANA, ARIZONA, ALABAMA, ARKANSAS,
KENTUCKY, MISSOURI, MONTANA, OKLAHOMA, SOUTH
CAROLINA, TENNESSEE, TEXAS, AND UTAH,
*Petitioners,*

*v.*

UNITED STATES DEPARTMENT OF ENERGY AND JENNIFER
GRANHOLM, SECRETARY OF ENERGY,

*Respondents.*

On Petition for Review of an Order of the
United States Department of Energy,

Agency No. EERE-2021-BT-STD-0002

**STATUTORY ADDENDUM**

**MARK BRNOVICH
ATTORNEY GENERAL**

Joseph A. Kanefield
*Chief Deputy & Chief of Staff*

Brunn ("Beau") W. Roysden III
 *Solicitor General*

\* Counsel of Record

Drew C. Ensign\*
 *Deputy Solicitor General*
Anthony R. Napolitano
Robert J. Makar
 *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, AZ 85004
Phone:   (602) 542-5025
Fax:    (602) 542-4377

*Counsel for the State of Arizona*

Dated: July 6, 2022

## 42 U.S. Code § 6295

### §6295. Energy conservation standards

#### (a) Purposes

The purposes of this section are to-

(1) provide Federal energy conservation standards applicable to covered products; and

(2) authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

#### (b) Standards for refrigerators, refrigerator-freezers, and freezers

…

#### (c) Standards for room air conditioners

…

#### (d) Standards for central air conditioners and heat pumps

…

#### (e) Standards for water heaters; pool heaters; direct heating equipment

…

#### (f) Standards for furnaces and boilers

…

#### (g) Standards for dishwashers; clothes washers; clothes dryers; fluorescent lamp ballasts

…

#### (h) Standards for kitchen ranges and ovens

…

#### (i) General service fluorescent lamps, general service incandescent lamps, intermediate base incandescent lamps, candelabra base incandescent lamps, and incandescent reflector lamps

…

#### (j) Standards for showerheads and faucets

…

ADD-1

## (k) Standards for water closets and urinals

...

## (l) Standards for other covered products

(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (20) of section 6292(a) of this title if the requirements of subsections (o) and (p) are met and the Secretary determines that-

(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

(D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

(2) Any new or amended standard for covered products of a type specified in paragraph (20) of section 6292(a) of this title shall not apply to products manufactured within five years after the publication of a final rule establishing such standard.

(3) The Secretary may, in accordance with subsections (o) and (p), prescribe an energy conservation standard for television sets. Any such standard may not become effective with respect to products manufactured before January 1, 1992.

(4) Energy efficiency standards for certain lamps.-

(A) In general.-The Secretary shall prescribe an energy efficiency standard for rough service lamps, vibration service lamps, 3-way incandescent lamps, 2,601–3,300 lumen general service incandescent lamps, and shatter-resistant lamps in accordance with this paragraph.

(B) Benchmarks.-Not later than 1 year after December 19, 2007, the Secretary, in consultation with the National Electrical Manufacturers Association, shall-

(i) collect actual data for United States unit sales for each of calendar years 1990 through 2006 for each of the 5 types of lamps described in subparagraph (A) to determine the historical growth rate of the type of lamp; and

(ii) construct a model for each type of lamp based on coincident economic indicators that closely match the historical annual growth rate of the type of lamp to provide a neutral comparison benchmark to model future unit sales after calendar year 2006.

(C) Actual sales data.-

(i) In general.-Effective for each of calendar years 2010 through 2025, the Secretary, in consultation with the National Electrical Manufacturers Association, shall-

(I) collect actual United States unit sales data for each of 5 types of lamps described in subparagraph (A); and

(II) not later than 90 days after the end of each calendar year, compare the lamp sales in that year with the sales predicted by the comparison benchmark for each of the 5 types of lamps described in subparagraph (A)

(ii) Continuation of tracking.-

(I) Determination.-Not later than January 1, 2023, the Secretary shall determine if actual sales data should be tracked for the lamp types described in subparagraph (A) after calendar year 2025.

(II) Continuation.-If the Secretary finds that the market share of a lamp type described in subparagraph (A) could significantly erode the market share for general service lamps, the Secretary shall continue to track the actual sales data for the lamp type.

(D) Rough service lamps.-

(i) In general.-Effective beginning with the first year that the reported annual sales rate for rough service lamps demonstrates actual unit sales of rough service lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall-

ADD-3

(I) not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

(II) not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for rough service lamps.

(ii) Backstop requirement.-If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of the issuance of the finding under clause (i)(I), the Secretary shall require rough service lamps to-

(I) have a shatter-proof coating or equivalent technology that is compliant with NSF/ANSI 51 and is designed to contain the glass if the glass envelope of the lamp is broken and to provide effective containment over the life of the lamp;

(II) have a maximum 40-watt limitation; and

(III) be sold at retail only in a package containing 1 lamp.

(E) Vibration service lamps.-

(i) In general.-Effective beginning with the first year that the reported annual sales rate for vibration service lamps demonstrates actual unit sales of vibration service lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall-

(I) not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

(II) not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for vibration service lamps.

(ii) Backstop requirement.-If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of the issuance of the finding under clause (i)(I), the Secretary shall require vibration service lamps to-

(I) have a maximum 40-watt limitation; and

(II) be sold at retail only in a package containing 1 lamp.

(F) 3-way incandescent lamps.-

ADD-4

(i) In general.-Effective beginning with the first year that the reported annual sales rate for 3-way incandescent lamps demonstrates actual unit sales of 3-way incandescent lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall-

   (I) not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

   (II) not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for 3-way incandescent lamps.

(ii) Backstop requirement.-If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of issuance of the finding under clause (i)(I), the Secretary shall require that-

   (I) each filament in a 3-way incandescent lamp meet the new maximum wattage requirements for the respective lumen range established under subsection (i)(1)(A) [2] ; and

   (II) 3-way lamps be sold at retail only in a package containing 1 lamp.

(G) 2,601–3,300 lumen general service incandescent lamps.-Effective beginning with the first year that the reported annual sales rate demonstrates actual unit sales of 2,601–3,300 lumen general service incandescent lamps in the lumen range of 2,601 through 3,300 lumens (or, in the case of a modified spectrum, in the lumen range of 1,951 through 2,475 lumens) that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall impose-

(i) a maximum 95-watt limitation on general service incandescent lamps in the lumen range of 2,601 through 3,300 lumens; and

(ii) a requirement that those lamps be sold at retail only in a package containing 1 lamp.

(H) Shatter-resistant lamps.-

(i) In general.-Effective beginning with the first year that the reported annual sales rate for shatter-resistant lamps demonstrates actual unit sales of shatter-resistant lamps that achieve levels that

ADD-5

are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall-

   (I) not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

   (II) not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for shatter-resistant lamps.

   (ii) Backstop requirement.-If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of issuance of the finding under clause (i)(I), the Secretary shall impose-

   (I) a maximum wattage limitation of 40 watts on shatter resistant lamps; and

   (II) a requirement that those lamps be sold at retail only in a package containing 1 lamp.

(I) Rulemakings before january 1, 2025.-

   (i) In general.-Except as provided in clause (ii), if the Secretary issues a final rule prior to January 1, 2025, establishing an energy conservation standard for any of the 5 types of lamps for which data collection is required under any of subparagraphs (D) through (G), the requirement to collect and model data for that type of lamp shall terminate unless, as part of the rulemaking, the Secretary determines that continued tracking is necessary.

   (ii) Backstop requirement.-If the Secretary imposes a backstop requirement as a result of a failure to complete an accelerated rulemaking in accordance with clause (i)(II) of any of subparagraphs (D) through (G),[4] the requirement to collect and model data for the applicable type of lamp shall continue for an additional 2 years after the effective date of the backstop requirement.

## (m) Amendment of standards

## (1) In general

   Not later than 6 years after issuance of any final rule establishing or amending a standard, as required for a product under this part, the Secretary shall publish-

(A) a notice of the determination of the Secretary that standards for the product do not need to be amended, based on the criteria established under subsection (n)(2); or

(B) a notice of proposed rulemaking including new proposed standards based on the criteria established under subsection (o) and the procedures established under subsection (p).

## (2) Notice

If the Secretary publishes a notice under paragraph (1), the Secretary shall‐

(A) publish a notice stating that the analysis of the Department is publicly available; and

(B) provide an opportunity for written comment.

## (3) Amendment of standard; new determination

### (A) Amendment of standard

Not later than 2 years after a notice is issued under paragraph (1)(B), the Secretary shall publish a final rule amending the standard for the product.

### (B) New determination

Not later than 3 years after a determination under paragraph (1)(A), the Secretary shall make a new determination and publication under subparagraph (A) or (B) of paragraph (1).

## (4) Application to products

### (A) In general

Except as provided in subparagraph (B), an amendment prescribed under this subsection shall apply to‐

(i) with respect to refrigerators, refrigerator‐freezers, freezers, room air conditioners, dishwashers, clothes washers, clothes dryers, fluorescent lamp ballasts, and kitchen ranges and ovens, such a product that is manufactured after the date that is 3 years after publication of the final rule establishing an applicable standard; and

(ii) with respect to central air conditioners, heat pumps, water heaters, pool heaters, direct heating equipment, and furnaces, such a product that is manufactured after the date that is 5 years after publication of the final rule establishing an applicable standard.

ADD‐7

### (B) Other new standards

A manufacturer shall not be required to apply new standards to a product with respect to which other new standards have been required during the prior 6-year period.

### (5) Reports

The Secretary shall promptly submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate-

(A) a progress report every 180 days on compliance with this section, including a specific plan to remedy any failures to comply with deadlines for action established under this section; and

(B) all required reports to the Court or to any party to the Consent Decree in State of New York v Bodman, Consolidated Civil Actions No. 05 Civ. 7807 and No. 05 Civ. 7808.

### (n) Petition for amended standard

(1) With respect to each covered product described in paragraphs (1) through (11), and in paragraphs (13) and (14) of section 6292(a) of this title, any person may petition the Secretary to conduct a rulemaking to determine for a covered product if the standards contained either in the last final rule required under subsections (b) through (i) of this section or in a final rule published under this section should be amended.

(2) The Secretary shall grant a petition if he finds that it contains evidence which, assuming no other evidence were considered, provides an adequate basis for amending the standards under the following criteria-

(A) amended standards will result in significant conservation of energy;

(B) amended standards are technologically feasible; and

(C) amended standards are cost effective as described in subsection (o)(2)(B)(i)(II).

The grant of a petition by the Secretary under this subsection creates no presumption with respect to the Secretary's determination of any of the criteria in a rulemaking under this section.

(3) Notice of decision.-Not later than 180 days after the date of receiving a petition, the Secretary shall publish in the Federal Register

a notice of, and explanation for, the decision of the Secretary to grant or deny the petition.

(4) New or amended standards.-Not later than 3 years after the date of granting a petition for new or amended standards, the Secretary shall publish in the Federal Register-

(A) a final rule that contains the new or amended standards; or

(B) a determination that no new or amended standards are necessary.

(5) An amendment prescribed under this subsection shall apply to products manufactured after a date which is 5 years after-

(A) the effective date of the previous amendment pursuant to this part; or

(B) if the previous final rule published under this part did not amend the standard, the earliest date by which a previous amendment could have been in effect, except that in no case may an amended standard apply to products manufactured within 3 years (for refrigerators, refrigerator-freezers, and freezers, room air conditioners, dishwashers, clothes washers, clothes dryers, fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, and kitchen ranges and ovens) or 5 years (for central air conditioners and heat pumps, water heaters, pool heaters, direct heating equipment and furnaces) after publication of the final rule establishing a standard.

## (o) Criteria for prescribing new or amended standards

(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

(2)(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

(B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the

ADD-9

standard exceed its burdens by, to the greatest extent practicable, considering-

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if-

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that the establishment of such standard is not technologically feasible or economically justified.

For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

(5) The Secretary may set more than 1 energy conservation standard for products that serve more than 1 major function by setting 1 energy conservation standard for each major function.

(6) Regional standards for furnaces, central air conditioners, and heat pumps.-

(A) In general.-In any rulemaking to establish a new or amended standard, the Secretary may consider the establishment of separate standards by geographic region for furnaces (except boilers), central air conditioners, and heat pumps.

(B) National and regional standards.-

ADD-11

(i) National standard.-If the Secretary establishes a regional standard for a product, the Secretary shall establish a base national standard for the product.

(ii) Regional standards.-If the Secretary establishes a regional standard for a product, the Secretary may establish more restrictive standards for the product by geographic region as follows:

(I) For furnaces, the Secretary may establish 1 additional standard that is applicable in a geographic region defined by the Secretary.

(II) For any cooling product, the Secretary may establish 1 or 2 additional standards that are applicable in 1 or 2 geographic regions as may be defined by the Secretary.

(C) Boundaries of geographic regions.-

(i) In general.-Subject to clause (ii), the boundaries of additional geographic regions established by the Secretary under this paragraph shall include only contiguous States.

(ii) Alaska and hawaii.-The States of Alaska and Hawaii may be included under this paragraph in a geographic region that the States are not contiguous to.

(iii) Individual states.-Individual States shall be placed only into a single region under this paragraph.

(D) Prerequisites.-In establishing additional regional standards under this paragraph, the Secretary shall-

(i) establish additional regional standards only if the Secretary determines that-

(I) the establishment of additional regional standards will produce significant energy savings in comparison to establishing only a single national standard; and

(II) the additional regional standards are economically justified under this paragraph; and

(ii) consider the impact of the additional regional standards on consumers, manufacturers, and other market participants, including product distributors, dealers, contractors, and installers.

(E) Application; effective date.-

ADD-12

(i) Base national standard.-Any base national standard
established for a product under this paragraph shall-

(I) be the minimum standard for the product; and

(II) apply to all products manufactured or imported into the
United States on and after the effective date for the standard.

(ii) Regional standards.-Any additional and more restrictive
regional standard established for a product under this paragraph
shall apply to any such product installed on or after the effective
date of the standard in States in which the Secretary has designated
the standard to apply.

(F) Continuation of regional standards.-

(i) In general.-In any subsequent rulemaking for any product for
which a regional standard has been previously established, the
Secretary shall determine whether to continue the establishment of
separate regional standards for the product.

(ii) Regional standard no longer appropriate.-Except as provided
in clause (iii), if the Secretary determines that regional standards
are no longer appropriate for a product, beginning on the effective
date of the amended standard for the product-

(I) there shall be 1 base national standard for the product with
Federal enforcement; and

(II) State authority for enforcing a regional standard for the
product shall terminate.

(iii) Regional standard appropriate but standard or region
changed.-

(I) State no longer contained in region.-Subject to subclause (III),
if a State is no longer contained in a region in which a regional
standard that is more stringent than the base national standard
applies, the authority of the State to enforce the regional standard
shall terminate.

(II) Standard or region revised so that existing regional
standard equals base national standard.-If the Secretary revises a
base national standard for a product or the geographic definition
of a region so that an existing regional standard for a State is
equal to the revised base national standard-

ADD-13

(aa) the authority of the State to enforce the regional standard shall terminate on the effective date of the revised base national standard; and

(bb) the State shall be subject to the revised base national standard.

(III) Standard or region revised so that existing regional standard equals base national standard.-If the Secretary revises a base national standard for a product or the geographic definition of a region so that the standard for a State is lower than the previously approved regional standard, the State may continue to enforce the previously approved standard level.

(iv) Waiver of federal preemption.-Nothing in this paragraph diminishes the authority of a State to enforce a State regulation for which a waiver of Federal preemption has been granted under section 6297(d) of this title.

(G) Enforcement.-
 (i) Base national standard.-

 (I) In general.-The Secretary shall enforce any base national standard.

 (II) Trade association certification programs.-In enforcing the base national standard, the Secretary shall use, to the maximum extent practicable, national standard nationally recognized certification programs of trade associations.

(ii) Regional standards.-

 (I) Enforcement plan.-Not later than 90 days after the date of the issuance of a final rule that establishes a regional standard, the Secretary shall initiate a rulemaking to develop and implement an effective enforcement plan for regional standards for the products that are covered by the final rule.

 (II) Responsible entities.-Any rules regarding enforcement of a regional standard shall clearly specify which entities are legally responsible for compliance with the standards and for making any required information or labeling disclosures.

(III) Final rule.-Not later than 15 months after the date of the issuance of a final rule that establishes a regional standard for a product, the Secretary shall promulgate a final rule covering enforcement of regional standards for the product.

(IV) Incorporation by states and localities.-A State or locality may incorporate any Federal regional standard into State or local building codes or State appliance standards.

(V) State enforcement.-A State agency may seek enforcement of a Federal regional standard in a Federal court of competent jurisdiction.

(H) Information disclosure.-

(i) In general.-Not later than 90 days after the date of the publication of a final rule that establishes a regional standard for a product, the Federal Trade Commission shall undertake a rulemaking to determine the appropriate 1 or more methods for disclosing information so that consumers, distributors, contractors, and installers can easily determine whether a specific piece of equipment that is installed in a specific building is in conformance with the regional standard that applies to the building.

(ii) Methods.-A method of disclosing information under clause (i) may include-

(I) modifications to the Energy Guide label; or

(II) other methods that make it easy for consumers and installers to use and understand at the point of installation.

(iii) Completion of rulemaking.-The rulemaking shall be completed not later 15 months after the date of the publication of a final rule that establishes a regional standard for a product.

## (p) Procedure for prescribing new or amended standards

Any new or amended energy conservation standard shall be prescribed in accordance with the following procedure:

(1) A proposed rule which prescribes an amended or new energy conservation standard or prescribes no amendment or no new standard for a type (or class) of covered products shall be published in the Federal Register. In prescribing any such proposed rule with respect to a standard, the Secretary shall determine the maximum improvement in energy efficiency or maximum reduction in energy

use that is technologically feasible for each type (or class) of covered products. If such standard is not designed to achieve such efficiency or use, the Secretary shall state in the proposed rule the reasons therefor.

(2) After the publication of such proposed rulemaking, the Secretary shall, in accordance with section 6306 of this title, afford interested persons an opportunity, during a period of not less than 60 days, to present oral and written comments (including an opportunity to question those who make such presentations, as provided in such section) on matters relating to such proposed rule, including-

(A) whether the standard to be prescribed is economically justified (taking into account those factors which the Secretary must consider under subsection (o)(2)) or will result in the effects described in subsection (o)(4);

(B) whether the standard will achieve the maximum improvement in energy efficiency which is technologically feasible;

(C) if the standard will not achieve such improvement, whether the reasons for not achieving such improvement are adequate; and

(D) whether such rule should prescribe a level of energy use or efficiency which is higher or lower than that which would otherwise apply in the case of any group of products within the type (or class) that will be subject to such standard.

(3) A final rule prescribing an amended or new energy conservation standard or prescribing no amended or new standard for a type (or class) of covered products shall be published as soon as is practicable, but not less than 90 days, after publication of the proposed rule in the Federal Register.

(4) Direct final rules.-

(A) In general.-On receipt of a statement that is submitted jointly by interested persons that are fairly representative of relevant points of view (including representatives of manufacturers of covered products, States, and efficiency advocates), as determined by the Secretary, and contains recommendations with respect to an energy or water conservation standard-

(i) if the Secretary determines that the recommended standard contained in the statement is in accordance with subsection (o) or section 6313(a)(6)(B) of this title, as applicable, the Secretary

ADD-16

may issue a final rule that establishes an energy or water conservation standard and is published simultaneously with a notice of proposed rulemaking that proposes a new or amended energy or water conservation standard that is identical to the standard established in the final rule to establish the recommended standard (referred to in this paragraph as a "direct final rule"); or

(ii) if the Secretary determines that a direct final rule cannot be issued based on the statement, the Secretary shall publish a notice of the determination, together with an explanation of the reasons for the determination.

(B) Public comment.-The Secretary shall solicit public comment for a period of at least 110 days with respect to each direct final rule issued by the Secretary under subparagraph (A)(i).

(C) Withdrawal of direct final rules.-

(i) In general.-Not later than 120 days after the date on which a direct final rule issued under subparagraph (A)(i) is published in the Federal Register, the Secretary shall withdraw the direct final rule if-

(I) the Secretary receives 1 or more adverse public comments relating to the direct final rule under subparagraph (B)(i) [5] or any alternative joint recommendation; and

(II) based on the rulemaking record relating to the direct final rule, the Secretary determines that such adverse public comments or alternative joint recommendation may provide a reasonable basis for withdrawing the direct final rule under subsection (o), section 6313(a)(6)(B) of this title, or any other applicable law.

(ii) Action on withdrawal.-On withdrawal of a direct final rule under clause (i), the Secretary shall-

(I) proceed with the notice of proposed rulemaking published simultaneously with the direct final rule as described in subparagraph (A)(i); and

(II) publish in the Federal Register the reasons why the direct final rule was withdrawn.

ADD-17

(iii) Treatment of withdrawn direct final rules.-A direct final rule that is withdrawn under clause (i) shall not be considered to be a final rule for purposes of subsection (o).

(D) Effect of paragraph.-Nothing in this paragraph authorizes the Secretary to issue a direct final rule based solely on receipt of more than 1 statement containing recommended standards relating to the direct final rule.

## (q) Special rule for certain types or classes of products

(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group-

(A) consume a different kind of energy from that consumed by other covered products within such type (or class); or

(B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

## (r) Inclusion in standards of test procedures and other requirements

Any new or amended energy conservation standard prescribed under this section shall include, where applicable, test procedures prescribed in accordance with section 6293 of this title and may include any requirement which the Secretary determines is necessary to assure that each covered product to which such standard applies meets the required

minimum level of energy efficiency or maximum quantity of energy use specified in such standard.

## (s) Determination of compliance with standards

Compliance with, and performance under, the energy conservation standards (except for design standards authorized by this part) established in, or prescribed under, this section shall be determined using the test procedures and corresponding compliance criteria prescribed under section 6293 of this title.

## (t) Small manufacturer exemption

...

## (u) Battery charger and external power supply electric energy consumption

...

## (v) Refrigerated beverage vending machines

(1) Not later than 4 years after August 8, 2005, the Secretary shall prescribe, by rule, energy conservation standards for refrigerated bottle or canned beverage vending machines.

(2) In establishing energy conservation standards under this subsection, the Secretary shall use the criteria and procedures prescribed under subsections (o) and (p).

(3) Any energy conservation standard prescribed under this subsection shall apply to products manufactured 3 years after the date of publication of a final rule establishing the energy conservation standard.

## (w) Illuminated exit signs

...

## (x) Torchieres

...

## (y) Low voltage dry-type distribution transformers

The efficiency of a low voltage dry-type distribution transformer manufactured on or after January 1, 2007, shall be the Class I Efficiency Levels for distribution transformers specified in table 4–2 of the "Guide for Determining Energy Efficiency for Distribution Transformers" published by the National Electrical Manufacturers Association (NEMA TP–1–2002).

ADD-19

**(z) Traffic signal modules and pedestrian modules**

...

**(aa) Unit heaters**

...

**(bb) Medium base compact fluorescent lamps**

...

**(cc) Dehumidifiers**

...

**(dd) Commercial prerinse spray valves**

...

**(ee) Mercury vapor lamp ballasts**

...

**(ff) Ceiling fans and ceiling fan light kits**

...

**(gg) Standby mode energy use**

...

**(hh) Metal halide lamp fixtures**

...